1
2
3
4
5
6
7
8                              UNITED STATES DISTRICT COURT
9                           FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11    MARK JOSEPH HAWES,                          No.  2:14-cv-02715-KJM-GGH
12                 Petitioner,
13          v.                                    ORDER AND FINDINGS AND
                                                  RECOMMENDATIONS
14    KIM HOLLAND,
15                 Respondent.
16
17    INTRODUCTION AND SUMMARY
18          Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus
19    pursuant to 28 U.S.C. § 2254.  Petitioner was convicted of lewd and lascivious acts with a child,
20    unlawful sexual intercourse with a child more than three years younger, oral copulation with a
21    child under 18, sexual penetration by foreign object with a child under 18, sodomy with a victim
22    under 18, and engaging in three or more sex acts with a child under 14.  Petitioner challenges his
23    conviction on the following grounds: 1) trial counsel rendered ineffective assistance of counsel
24    by, *inter alia*, failing to perform forensic testing of physical evidence, failing to investigate or call
25    witnesses, failing to subpoena medical records, failing to object to privileged testimony, and
26    failing to communicate with petitioner; 2) the trial court violated petitioner's Sixth Amendment
27    right to counsel when it failed appoint new counsel at the Marsden hearing; 3) the admission of
28    Angela Bryant's testimony regarding her sexual relationship with petitioner violated petitioner's

right to due process; 4) there was insufficient evidence to convict petitioner of oral copulation of K.; and 5) the prosecution withheld exculpatory material evidence from petitioner.  In conjunction with his ineffective assistance of counsel claims, petitioner has requested an evidentiary hearing be held.

Upon careful consideration of the record and the applicable law, the request for an evidentiary hearing is denied and undersigned recommends that petitioner's application for habeas corpus relief be denied.

BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Defendant was in law enforcement from 1990 to 2001, then went to work for United Parcel Service.  When he married the victims' mother, she had three small children: two little girls and a boy.  He took charge of the family, and the children complied with his orders.  For the girls, this meant years of subjugation and sexual abuse.  Their testimony at trial was harrowing.
>
> **The Victims**
>
> M. was 17 when she testified.  The abuse began when she was nine.  She was lying in her bed when defendant began rubbing her leg and then her vagina.  The prosecutor asked her to chronical the molestations—oral, vaginal, and anal sex—that occurred during the two-year period that preceded her disclosure.
>
> As for the molestations, she estimated that defendant would rub her leg and vagina as he tucked her in at night at least twice a week.  He threatened her, telling her she would never see her mother again if she ever told anyone.  If she said no, he would stomp off, slam the door, retreat to his room, and not speak to anyone for days.  He molested her while the family watched television or went swimming.  On four occasions, he instructed her to pretend she was sick and unable to go to church with her mother.  When the family was gone, he would molest her.  On another occasion he jumped out of the closet in her room while other family members were outside swimming, and touched her vagina underneath her clothes.
>
> M. estimated that she put her mouth on defendant's penis 8 to 10 times, and he put his mouth on her vagina 10 to 15 times.  The oral copulation occurred in both her bed and his.  On one occasion, he came into her room, pulled down his pajama bottoms, began rubbing his penis, and then, holding the bars on her bed, thrust his penis into her mouth.  When she tried to move her head, he moved

it back and held it there.  On other occasions, he would kneel beside her bed or get on the bed on his knees, hold the bars, and put his mouth on her vagina and lick it.

During the same two-year period, defendant had sexual intercourse with M. 10 to 15 times.  If she grimaced, he made her smile.  If she cried, he made her stop.  Sometimes he made her masturbate in front of him before sexual intercourse because, he said, it made him hard and got him in the mood.  One of the mornings when he made her pretend to be sick, he went into her bedroom and instructed her to come into his room.  When she walked into the room, he was lying naked on the bed.  He made her sit on him, and eventually he penetrated her vagina.

Defendant put his fingers inside M.'s vagina about 30 times over those two years.  She described one incident when the rest of the family was in the backyard swimming:  she and defendant were in the living room with the blinds closed, and he started kissing her neck and forehead.  Eventually he placed his hands down her shorts and his fingers in her vagina.

Frequently, defendant asked M. to wear a skirt with no underwear.  Once, he ordered her downstairs to try something different.  He put her on the couch with her buttocks up on him.  Standing, he put his penis in her "butt."  She told him to stop because it hurt, but he assured her the pain would only last a few minutes.  On another occasion, he put his penis in her anus and she bled.

Although during this time defendant was having very little sex with his wife, he was having sex regularly with not only M., but her younger sister K. as well.  Following a back injury, defendant had difficulty sustaining an erection.  Although he told his wife he had discontinued the medication he was taking for this condition because of the side effects, in fact he refilled the prescription many times.  Empty and near-empty bottles were found among his things.

K. was only four or five years old when defendant began exploiting her.  Her account, like that of her sister, is gut wrenching.  She was 12 at the time of trial.  When she was four or five she would pretend to be a princess by taking off all her clothes and wrapping herself in a Mickey Mouse blanket as her gown.  Defendant would kiss her neck and put his finger in her private every time her mother left the house.  She estimated it was more than 100 times.  Defendant also made her grab on to his penis, and he licked her vagina several times.  When K. was in about third grade and under 10 years old, defendant had her take off her pants and underwear and sit on his shoulders with his face toward her vagina.  He shoved her against the wall and started licking her vagina.  She remembered that this incident occurred in defendant's bedroom.

The many other incidents were equally sordid.  While her aunt was out of town, defendant and K. went to her house, and on multiple occasions, he made her give him a "big kissy," licked her vagina, and put his finger in her vagina.  While K. was naked, defendant would "spank" her by rubbing her bare buttocks and putting his

fingers in her vagina.  He made her look at his penis, even though she told him she did not want to see it.

K. described some of the things her father said to her when she was doing things he made her do, such as, "[Y]ou didn't think this was creepy a few years ago and now you are all freaked out."  Referring to her ability to make his penis hard, he said, "[O]h, [K.], baby you are making me feel so good."  After every encounter, he warned her never to tell anyone.

On one occasion, defendant made K. get on her hands and knees like a dog, placed his penis in her vagina, and went back and forth with it.  He instructed her to "[l]et it go."  When he finished, he made her "pinky promise" not to tell anyone.

Defendant's charade all fell apart before a family pizza and movie night on Friday, August 20, 2010.  K. testified that after she arrived home from school, defendant instructed her to wear a skirt without shorts on underneath.  He signaled her to come into his bedroom, and locked the door.  He made K. kiss him on the mouth and get on the bed.  He put a vibrator inside K.'s vagina and started moving it around, all the while instructing her to "[l]et it go" and to just "go crazy."  He put his fingers in her vagina and touched her buttocks and breasts.  He orally copulated her.  Before leaving, defendant made K. give him another "big kiss."

M. accompanied her mother to pick up the pizza.  En route, M. encouraged her mother to divorce defendant.  When her mother resisted, M. told her that defendant had touched her.  He mother was horrified and shocked.  She dropped M. off at a family friend's house and went home to confront her husband.  He denied having any inappropriate physical contact with M.

M. was interviewed and defendant was arrested.  As her mother explained to her why defendant had been arrested, K. blurted out that defendant had "been doing that to me for years."  K. was later interviewed at a special assault forensic evaluation (a SAFE interview).  The video of the SAFE interview was played for the jury.

**Other Women Step Forward**

The victims were not the only ones to testify to defendant's creepy behavior.  Kr., his daughter from a previous marriage, lived with defendant and his new family for a couple of years.  She testified she had observed seven- or eight-year old M. on the top bunk of her bed with her legs dangling over the side with each of her legs on defendant's shoulders.  She saw her father's face between M.'s legs, and M. was giggling.  When he realized Kr. was there, he angrily ordered her to go downstairs.  She also testified on another occasion she observed her father supervising her younger siblings and cousins, all running around through the sprinklers naked.  He was the only adult present, and although Kr. told him it "was not right," he told her he thought it was funny.

In the early 1990's defendant had a sexual relationship with Angela B.  She testified that before and during her brief marriage to defendant, he had her act like a little girl during sex.  He had her wear short clothing and put her hair in pigtails.  Then they would play-act.  He would have her get into bed.  While she pretended to sleep, he would quietly crawl into bed behind her and rub his penis against her back and bottom.  He referred to her as "daddy's little girl" and asked her questions like, "Has daddy's little girl been bad?"

**Defendant Testifies**

Defendant categorically denied all the testimony offered by M., K., Kr., and Angela.  He proclaimed his innocence of all charges.

M., he claimed, had come on to him several times the week before she accused him of sexually abusing her.  Each time he rebuffed her advances.  He never told her mother because he did not want to destroy his family.  He explained that he had told M. she might have to be home schooled again because of the strain her schedule had on the family.  He believed she was angry with him and lied so she could remain in public school.  She was unhappy because her mother would not divorce him.

Defendant speculated that M. might be responsible for K.'s stories.  He put a different spin on many of the accounts K. had provided.  He insisted he would never sexually abuse a child.

Defense counsel attempted to discredit both Kr. and Angela.  Kr. admitted she had been unhappy living with her father as a teenager and wanted to return to Alabama to live with her mother.  During a heated and protracted custody battle, she ultimately stated she did not believe her father had done anything inappropriate.

During cross-examination of Angela, defense counsel exposed her mental health history, including two hospitalizations and a diagnosis of depression as well as attention deficit and obsessive-compulsive disorders.  Angela assured the court and jury that her diagnoses did not impact her ability to recall the evens she had described.

People v. Hawes, 2012 Cal. App. Unpub. LEXIS 7307, at **1–9 (October 5, 2012).

After petitioner's judgment of conviction was affirmed by the California Court of Appeal, he filed a petition for review in the California Supreme Court.  Resp't's Lod. Doc. 9.  The Supreme Court summarily denied that petition without comment or citation by order.  Resp't's Lod. Doc. 10.  Petitioner then filed three state habeas petitions.  The first petition, filed with the Sacramento Superior Court, was denied in a reasoned order.  Resp't's Lod. Docs. 11 & 12.  The second and third petitions, filed with the Third District Court of Appeal and the California

Supreme Court, respectively, were denied without comment or citation.  Resp't's Lod. Docs. 13–16.

DISCUSSION

I.      AEDPA Standards

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. 770, 785 (2011).  Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 784–785, citing Harris v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'"  Harrington, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000).  "A state

1  court's determination that a claim lacks merit precludes federal habeas relief so long as

2  'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786,

3  citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

4      Accordingly, "a habeas court must determine what arguments or theories supported or . . .

5  could have supported[] the state court's decision; and then it must ask whether it is possible

6  fairminded jurists could disagree that those arguments or theories are inconsistent with the

7  holding in a prior decision of this Court." Id. "Evaluating whether a rule application was

8  unreasonable requires considering the rule's specificity.  The more general the rule, the more

9  leeway courts have in reaching outcomes in case-by-case determinations.'" Id.  Emphasizing the

10  stringency of this standard, which "stops short of imposing a complete bar of federal court

11  relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

12  cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

13  was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

14      The undersigned also finds that the same deference is paid to the factual determinations of

15  state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

16  subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

17  decision that was based on an unreasonable determination of the facts in light of the evidence

18  presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

19  2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

20  factual error must be so apparent that "fairminded jurists" examining the same record could not

21  abide by the state court factual determination.  A petitioner must show clearly and convincingly

22  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct.

23  969, 974 (2006).

24      The habeas corpus petitioner bears the burden of demonstrating the objectively

25  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

26  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

27  show that the state court's ruling on the claim being presented in federal court was so lacking in

28  justification that there was an error well understood and comprehended in existing law beyond

7

1   any possibility for fairminded disagreement." <u>Harrington</u>, 131 S.Ct. at 786–87.  "Clearly

2   established" law is law that has been "squarely addressed" by the United States Supreme Court.

3   <u>Wright v. Van Patten</u>, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of

4   settled law to unique situations will not qualify as clearly established.  <u>See</u> <u>e.g.</u>, <u>Carey v.</u>

5   <u>Musladin</u>, 549 U.S. 70, 76, 127 S.Ct. 649, 653–54 (2006) (established law not permitting state

6   sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

7   prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

8   established law when spectators' conduct is the alleged cause of bias injection).  The established

9   Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

10  controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

11  federal courts.  <u>Early v. Packer</u>, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

12          When a state court decision on a petitioner's claims rejects some claims but does

13  not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal,

14  that the federal claim was adjudicated on the merits.  <u>Johnson v. Williams</u>, ___ U.S. ___, 133

15  S.Ct. 1088, 1091 (2013).  However, if the state courts have not adjudicated the merits of the

16  federal issue, no AEDPA deference is given; the issue is reviewed *de novo* under general

17  principles of federal law.  <u>Stanley v. Cullen</u>, 633 F.3d 852, 860 (9th Cir. 2012).

18          The state courts need not have cited to federal authority, or even have indicated awareness

19  of federal authority in arriving at their decision.  <u>Early</u>, 537 U.S. at 8.  Where the state courts have

20  not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will

21  independently review the record in adjudication of that issue.  "Independent review of the record

22  is not de novo review of the constitutional issue, but rather, the only method by which we can

23  determine whether a silent state court decision is objectively unreasonable."  <u>Himes v. Thompson</u>,

24  336 F.3d 848, 853 (9th Cir. 2003).

25  / / /

26  / / /

27  / / /

28  / / /

8

II.      <u>Ineffective Assistance of Counsel (Claims 1 through 19)</u>

Petitioner claims that he was deprived of effective assistance of counsel.  He contends that trial counsel was ineffective for the following reasons:

Claim 1: Failing to conduct DNA analysis on the massager used on K.

Claim 2: Failing to subpoena M.'s medical records.

Claim 3: Failing to secure petitioner's medical records.

Claim 4: Failing to conduct DNA analysis of petitioner's bedding.

Claim 5: Failing to investigate a prior molest of M. and K. by their biological father.

Claim 6: Failing to follow the procedures outlined in California Evidence Code section 782 to show M.'s propensity to lie about sexual matters.

Claim 7: Failing to subpoena M.'s Facebook account.

Claim 8: Failing to subpoena M.'s computer and media.

Claim 9: Failing to interview M.'s friends.

Claim 10: Failing to obtain an expert to testify regarding the special assault forensic evaluation ("SAFE") interview technique.

Claim 11: Failing to interview alibi witnesses.

Claim 12: Failing to raise a marital privilege objection on petitioner's behalf.

Claim 13: Failing to subpoena Angela Bryant's medical records.

Claim 14: Failing to collect information from petitioner's computer.

Claim 15: Failing to subpoena Comcast's operation records.

Claim 16: Failing to request rape/assault kits of M. and K.

Claim 17: Failing to secure a lie detector test.

Claim 18: Failing to properly communicate with petitioner.

Claim 19: Cumulative error.

As more fully discussed below, petitioner failed to show that trial counsel's representation fell below an objective standard of reasonableness and how he was prejudiced by trial counsel's alleged ineffectiveness.  Accordingly, petitioner's ineffective assistance of counsel claims should be denied.

1        A. Applicable Legal Principles

2        The test for demonstrating ineffective assistance of counsel is set forth in Strickland v.

3   Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  First, a petitioner must show

4   that, considering all the circumstances, counsel's performance fell below an objective standard of

5   reasonableness.  Id. at 688.  To this end, the petitioner must identify the acts or omissions that are

6   alleged not to have been the result of reasonable professional judgment.  Id. at 690.  The federal

7   court must then determine whether in light of all the circumstances, the identified acts or

8   omissions were outside the wide range of professionally competent assistance.  Id.  "We strongly

9   presume that counsel's conduct was within the wide range of reasonable assistance, and that he

10  exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg,

11  898 F.2d 695, 702 (9th Cir.1990), citing Strickland at 466 U.S. at 689.

12       Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at 693.

13  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional

14  errors, the result of the proceeding would have been different.  A reasonable probability is a

15  probability sufficient to undermine confidence in the outcome."  Id.  "That requires a

16  'substantial,' not just 'conceivable,' likelihood of a different result."  Cullen v. Pinholster, 131 S.

17  Ct. 1388, 1403, 179 L.Ed.2d 557 (2011) quoting Richter, 562 U.S., at ----, 131 S. Ct. at 791.

18       The Supreme Court has emphasized the importance of giving deference to trial counsel's

19  decisions, especially in the AEDPA context:

20              In Strickland we said that "[j]udicial scrutiny of a counsel's
            performance must be highly deferential" and that "every effort
21          [must] be made to eliminate the distorting effects of hindsight, to
            reconstruct the circumstances of counsel's challenged conduct, and
22          to evaluate the conduct from counsel's perspective at the time." 466
            U.S., at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 [ ].  Thus, even when a
23          court is presented with an ineffective-assistance claim not subject to
            § 2254(d)(1) deference, a [petitioner] must overcome the
24          "presumption that, under the circumstances, the challenged action
            'might be considered sound trial strategy.' "  Ibid. (quoting Michel
25          v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83[ ]
            (1955)).
26

27  ///

28  ///

10

> For [petitioner] to succeed, however, he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly. <u>See Williams</u>, supra, at 411, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398[ ]. Rather, he must show that the [ ]Court of Appeals applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner.

<u>Bell v. Cone</u>, 535 U.S. 685, 698–99, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002).

    B.   <u>Analysis</u>

        1.   *Claims 1 and 4 – DNA Analysis*

Petitioner contends trial counsel was ineffective for failing to conduct DNA analysis on the "massager" that was used on K. and on petitioner's bedding. He *argue*s that because the police seized both the massager and the bedding, there was substantial DNA evidence to prove or disprove M. and K.'s allegations. Petitioner contends trial counsel should have filed a motion to require forensic examination and the failure to do so constituted ineffective assistance of counsel. Petitioner presented these claims to state court in a habeas petition. Resp't's Lod. Doc. 11, Grounds 3 & 4. The state court rejected these claims reasoning that petitioner did not present results of any DNA testing on physical evidence and thus could not show prejudice as the result of trial counsel's actions. Resp't's Lod. Doc. 12, at 2.

The decision to perform forensic testing on physical evidence is a tactical one. <u>See</u> <u>Richter</u>, 131 S.Ct. at 789; <u>Grisby v. Blodgett</u>, 130 F.3d 365, 372 (9th Cir. 1997). The Supreme Court has noted that defense strategies in criminal cases will differ even among the best attorneys:

> There are, however, "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defendant a particular client in the same way." Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach.

<u>Richter</u>, 131 S.Ct. 788–89 (internal citation omitted). There may have been many reasons for trial counsel to decide against testing the massager and the bedding. For example, the risk of a positive match to defendant may well have been too great to proceed with this tactic. Instead, trial counsel put together a defense consisting of discrediting M. and K.'s account of the events (1 RT 131, 338), showing bias on the part of M. (1 RT 132), discrediting Krystal Hawes's

11

testimony (1 RT 172), discrediting Angela Bryant's testimony via introducing evidence of her mental disorders (1 RT 378), presenting an appearance that the police investigation was shoddy (1 RT 405), and allowing defendant to testify to explain the allegations (1 RT 408–36).  If trial counsel had ordered the testing, it would have been at the cost of forgoing one or more of these other strategies and for very little benefit.  That is, even if DNA testing on the massager and bedding came back favorable to petitioner, that potential evidence may have been relevant to two of the seventeen counts of sexual misconduct all of which petitioner was found guilty.  (1 CT 196–212).  On the other hand, unfavorable testing results would severely undermine the defense's theory that all of the allegations were fabricated and/or easily explained away.  As such, petitioner cannot show that trial counsel's tactical decision fell below an objective standard of reasonableness.

Even if petitioner can argue that his counsel should have done what petitioner in hindsight alleges presently, in no way, shape, or form has petitioner demonstrated *with facts* the potential for any prejudice. The undersigned pauses here to remark on a continuing problem with petitioner's arguments that exist not only here, but for the vast majority of claims made herein. Petitioner believes that he can simply posit the allegation of potential prejudice, and the federal court must hold an evidentiary hearing to see if the allegation is true.  However, as discussed in the last section of these Findings, Cullen v. Pinholster, 131 S.Ct. 1388 (2013), precludes this court from ascertaining the facts outside the state court record.  Petitioner may not use federal habeas as a mechanism to discover and prove the facts which he did not present to the state courts.  If his presentation of evidence in the state courts is "zero," and the state court decides the claim on "zero," and assuming that the state courts did nothing to unduly thwart the presentation of *facts* which would require the state court to hold an evidentiary hearing, "zero," is what the federal court must make its decision upon. It follows that:  zero plus zero equals zero.

Given that petitioner demonstrated no facts which would have required the state court to hold an evidentiary hearing on his DNA claims, his "zero" presentation requires a finding of no prejudice herein.

/ / /

### 2.   Claims 2, 3 & 13 – Medical Records Subpoenas

Petitioner further contends trial counsel was ineffective for failing to subpoena certain medical records, including records exposing M.'s allergy to latex, showing petitioner's severe back injury, and demonstrating Angela Bryant's mental disorders.  He contends records showing M.'s allergy to latex would have demonstrated that M.'s testimony regarding petitioner using latex condoms when he had vaginal intercourse with her was false.  As to the records of his severe back injury, he contends these records showing petitioner was limited to lifting five pounds would negate K.'s testimony that, during the same time period, petitioner lifted K. up to place her on his shoulders.  With regard to Angela Bryant's records, petitioner contends these would show that her mental disorders rendered her incompetent to testify.

Petitioner presented these claims to state court in a habeas petition.  Resp't's Lod. Doc. 11, Grounds 11, 12 & 13.  The state court rejected these claims reasoning that petitioner did not present documents demonstrating what trial counsel would have discovered had she subpoenaed them.  Resp't's Lod. Doc. 12, at 2.  In addition to the lack of documentation supporting these claims, the information the records would have revealed were presented at trial.  Rebecca Hawes, M.'s mother, testified that M. was not allergic to latex.  1 RT 482.  Several witnesses acknowledged that petitioner had a back injury.  See e.g., 1 RT 137 (M. noting that petitioner had a back injury while he homeschooled M.), 226 (Rebecca Hawes noting petitioner's back injury).  Angela Bryant's mental disorders were thoroughly discussed.  See e.g., 1 RT 378 (Ms. Bryant's testimony regarding her diagnosis of major depression, obsessive compulsive disorder and attention deficit disorder).  As such, petitioner cannot show that he suffered prejudice from the lack of medical records relating to these topics.

### 3.   Claim 5 – Failure to Investigate Prior Molest by Victims' Biological Father

Petitioner claims trial counsel should have investigated into a prior molest by M. and K.'s biological father.  Petitioner made this identical claim in his state habeas corpus petition.  Resp't's Lod. Doc. 11, Ground 1.  The trial court rejected this claim stating that "[p]etitioner makes numerous allegations that his trial counsel was ineffective for failing to conduct adequate pre-trial investigation.  Yet, Petitioner has not attached any evidence of what counsel could have

discovered by conducting such an investigation: [inter alia,] no documents showing the alleged molestation by the victims' biological father . . . ."  Resp't's Lod. Doc. 12 at 2.  This claim wholly consists of petitioner's unsubstantiated statements.  Accordingly, this claim should be dismissed.

### 4.   *Claim 6 – Failure to Comply with Evidence Code Section 782*

Petitioner claims trial counsel rendered ineffective assistance of counsel by failing to follow the proper procedures to attack M.'s credibility on the basis of her alleged past sexual conduct.  The California Court of Appeal denied this claim as follows:

> The trial court aborted defense counsel's attempt to discredit M., suggesting she had lied to a police officer about her sexual history. On its own motion, the trial court interrupted cross-examination and pointed out that defense counsel had failed to follow the procedures set forth in Evidence Code section 782 as a condition precedent to introducing evidence of a victim's prior sexual conduct. Defense counsel declined an invitation to comment. The trial court struck M.'s answer to defense counsel's question and admonished the jury to disregard the question and answer. Defendant asserts his lawyer provided inadequate representation, and denied him his right to effective cross-examination and confrontation of M. in violation of the Sixth Amendment to the United States Constitution.
>
> A criminal defendant must demonstrate not only that counsel's performance was deficient but that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694.) Prejudice is a prerequisite to defendant's claim, a hurdle he is unable to surmount.
>
> Defendant exaggerates the weaknesses in M.'s testimony and ignores the strength of the corroboration offered by other witnesses. He suggests that the number of alleged episodes kept dribbling out and growing over time. He asserts she had the motive to lie to encourage her mother to divorce him and to thwart his threat of home schooling. Had the jurors known that she did not tell the whole truth to the investigating police officer about having had any sex with someone other than defendant, in defendant's view they would have disregarded her account entirely. Defendant's speculation is implausible.
>
> It is not surprising that a teenager would deny or minimize her past sexual conduct when confronted by a police officer. Her adolescent prudishness seems trite when compared to the strength of her testimony describing the innumerable sexual episodes initiated by defendant. She described, in convincing and shocking detail, how defendant forced himself on her repeatedly for many years and how, defenseless as a little girl, she was forced to engage in oral copulation, sexual intercourse, and sodomy in addition to enduring years of molestation. We reject defendant's contention that the jury would have ignored or discounted her testimony because, at the

14

time of her initial interview, she was not immediately forthcoming.

Moreover, even if the jury had learned she lied, it is not reasonably probable they would have discounted K.'s, Angela's, and Kr.'s testimony, all of which soundly corroborated M.'s accounts. Indeed, K. testified that she remembered one night when she still shared a room with M. that defendant came into the room, climbed up on the top bunk, and the bunk rocked back and forth. K. blurted out her account that defendant had sexually abused her consistently since she was four or five years old as soon as her mother explained what had happened and without the opportunity to discuss the allegations with M. Any minor inconsistencies in her testimony pale in comparison to the specificity she provided and the grim reality that defendant victimized her on such a regular basis over such a long period of time.

Of course, Angela's testimony established defendant's proclivity for having sex with young girls, since he made his young girlfriend, and later wife, dress like a little girl with pigtails and play-act that he was her daddy. Given K.'s and Angela's testimony, there is no reasonable probability that the jury would have disbelieved all of M.'s testimony even if she had had another sexual relationship and lied about it.

And finally, defendant's own daughter corroborated M.'s testimony that something very unseemly had occurred. Arriving in M.'s bedroom unannounced, she observed her father's face close to M.'s crotch and M.'s legs perched on his shoulders. It is true that defendant took every opportunity to impeach Angela and Kr. by attacking their mental health and their motives to lie. The jury was made well aware of any liabilities they had. But in considering the testimony cumulatively, the evidence is consistent and overwhelming that defendant preyed on M. and K. in a manner consistent with his long-standing attraction to young girls. For all these reasons, there is simply no reasonable probability that the result of the proceeding would have been any different even if counsel had complied with Evidence Code section 782, and even if, however unlikely, the trial court had admitted the evidence to discredit M.

Hawes, 2012 Cal. App. Unpub. LEXIS 7307, at **15–19.

Trial counsel may have made a mistake in failing to follow the proper procedure to attack M.'s credibility pursuant to California Evidence Code section 782, but she declined the court's invitation to comment and proceeded with another line of questioning on cross-examination. Trial counsel may have made this tactical decision to press forward and to rely on the previous inconsistent statements M. had made rather than to paint a more specific picture that M. consistently lied about sexual matters. She may have decided that cornering a 17-year-old witness—who just described, in detail, numerous instances of molest—about a collateral matter

1   might have made her look like a bully in the eyes of the jury.  Whatever the reasoning was behind

2   the decision to forgo exploration into M.'s sexual conduct, it cannot be said that the decision fell

3   below an objective standard of reasonableness.  As explained by the California Court of Appeal,

4   M.'s testimony was corroborated by several witnesses.  As a result, petitioner cannot demonstrate

5   prejudice resulting from trial counsel's misstep, if it even can be called that.  Petitioner has not

6   satisfied the requirements of <u>Strickland</u>, thus, failed to show that the California Court of Appeal's

7   decision on this claim as objectively unreasonable.  This claim should be denied.

8               *5.  Claims 7 & 8 – Failure to Subpoena M.'s Computer and Social Media Activity*

9               Petitioner contends trial counsel was ineffective for failing to obtain information from

10   M.'s electronic and social media activity.  He asserts that, at the time of his arrest, M. described

11   her life as "perfect" on her Facebook profile and that emails and messages between M. and her

12   friends would support petitioner's theory that M.'s story was "ever changing."  Petitioner made

13   these claims in his state habeas corpus petition.  Resp't's Lod. Doc. 11, Grounds 8 & 15.  The

14   trial court rejected these claims stating that petitioner did not attach any evidence of what counsel

15   could have discovered by conducting such an investigation into records from M.'s Facebook

16   activity, her computer, or her cell phone.  Resp't's Lod. Doc. 12, at 2.

17               It is not surprising that a teenage girl would describe her life as "perfect" on social media

18   but in reality experience horrific circumstances at home.  Here, M had resisted telling anyone

19   about the molest for a lengthy period of time.  It is therefore not surprising, or worthy of an

20   evidentiary hearing, to view records where M had not presented herself as an unwilling

21   participant in years of abuse.  A recordation of abuse would have meant that M had determined to

22   turn her stepfather over to authorities—a decision that would inevitably involve M in reliving all

23   of the abuse, and having such abuse become the focal point of her life for months in a criminal

24   process.  This is a decision that is seldom made at the start of an abusive relationship.

25               Moreover, it is beyond cavil that most youths like to portray themselves as attractive to

26   other persons.  A recoded chronology of being abused would have made M very unattractive to

27   many persons, making most persons shy away—either not wanting to be vicariously involved in

28   what was undeniably a criminal situation, or not having a relationship with someone who would

be most certainly psychologically scarred.  Reflecting that her life was "perfect" on social media is no different than her saying "good," when asked by anyone "how are you doing?"

In addition, petitioner's reasoning for seeking M.'s text messages—that she texted her friends a lot—does not describe a unique characteristic of M.  Indeed M., like any teenage girl with a cell phone, sent text messages to her friends.  There is no indication that a review of those text messages would have lead to relevant, exculpatory evidence.  <u>See</u> above discussion. Trial counsel's decision to not review these messages cannot be said to have been objectively unreasonable.  Furthermore, similar to Claim 6 which also related to information that would attack M.'s credibility, petitioner failed to demonstrate prejudice, as even if those records revealed what petitioner said they would, several other witnesses corroborated M.'s testimony.  Accordingly, these claims should be denied.

### 6.  Claims 9 & 11– Failure to Interview or Call Witnesses

Petitioner claims trial counsel was ineffective for failing to interview or call M.'s close friends as witnesses, all of whom could testify to M.'s propensity to lie, as well as failing to interview two alibi witnesses, whose testimony would have placed petitioner away from the alleged scene on the dates specified by K.  Petitioner made these claims in his state habeas corpus petition.  Resp't's Lod. Doc. 11, Grounds 6 & 9.  The trial court rejected these claims stating that petitioner did not attach any evidence of what counsel could have discovered had she interviewed these witnesses.  Resp't's Lod. Doc. 12, at 2.

As the state court reasonably concluded, these claims fail because petitioner has not provided declarations from M.'s friends or from the alibi witnesses, demonstrating their willingness to testify and the substance of their testimony.  <u>See</u> <u>Allen v. Woodford</u>, 395 F.3d 979, 1002 n.2 (9th Cir. 2004) (district court correctly disregarded counsel's failure to call witnesses because petitioner made no showing that they would have testified); <u>Dows v. Wood</u>, 211 F.3d 480, 486–87 (9th Cir. 2000) (petitioner presented no evidence that alleged alibi witness actually existed or that they would have provided helpful testimony; i.e. presented no affidavit from the witness); <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1088 (9th Cir. 2001) (petitioner failed to identify what witness would have said, thus his claim was wholly speculative); <u>United States v. Berry</u>, 814 F.2d

1406, 1409 (9th Cir. 1989) (petitioner "offers no indication of what these witnesses would have

testified to, or how their testimony might have changed the outcome of the hearing").

Accordingly, these claims should be denied.

### 7. Claim 10– Failure to Retain an Expert Regarding SAFE Interview Techniques

Petitioner claims the SAFE interview technique asks suggestive questions with "yes" or

"no" answers.  He argues that defense counsel should have obtained an expert on the interview

technique to poke holes in the reliability of the interview.  However, petitioner has provided no

declaration from an expert supporting this claim. Speculation about what an expert could have

said is not enough to establish prejudice. See Grisby, 130 F.3d at 373.  Accordingly, this claim

should be denied.

### 8. Claim 12 – Failure to Object and Assert Privilege on Petitioner's Behalf

Petitioner contends trial counsel was ineffective for failing to object on marital privilege

grounds to questions posed to Angela Bryant, petitioner's ex-wife, regarding their sex life.  The

court of appeal rejected this claim as follows:

> Finally, defendant complains that his lawyer did not assert his marital privilege to keep out the testimony of his ex-wife about his deviant sexual practices before and during marriage. His claim fails again because he cannot demonstrate the requisite prejudice.
>
> The Attorney General does not dispute that oral and written confidential communications between spouses are privileged. (Evid. Code, § 980; *People v. Cleveland* (2004) 32 Cal.4th 704, 742-743.) The problem with defendant's argument, however, is that the record discloses the same play-acting occurred both before and during the marriage. Thus, even if defendant's lawyer had asserted the privilege and successfully excluded evidence that defendant told his wife to dress up like a little girl, put her hair in pigtails, and crawl into bed and pretend she was asleep so he could sneak in and rub his penis on her back and buttocks, the same evidence would have been admitted that he made those statements before they were married. The privilege does not apply to descriptions of sex acts or communications between defendant and Angela before they were married. (*Rubio v. Superior Court* (1988) 202 Cal.App.3d 1343, 1347; *People v. Dorsey* (1975) 46 Cal.App.3d 706, 717.)
>
> We disagree with defendant's representation of the record. He insists that the evidence that he asked, suggested, directed, or ordered Angela to play-act before they were married is minimal. Not so. Angela testified that she had dated defendant on and off for about a year before their brief, nine-month marriage. The prosecutor specifically asked: "During the time that you were

1

2

3

indicating Mr. Hawes on and off again for a year and married to
him for approximately nine months, do you have a recollection of
how many times you play acted this situation being a little girl?"
Angela responded, "A lot. I don't -- I can't say how many times. It
was a lot." She then described the acts again in some detail.

4

5

6

7

8

9

10

Regarding the time during which they were dating and not married,
the prosecutor asked: "And then what were your instructions? What
were you to do, Ms. Bryant, when Mr. Hawes snuck into the bed
like that and did that to you?" She testified:  "He would ask me
questions, 'Has daddy's little girl been bad?' You know, 'Does
daddy's little girl like this?' Those kinds of things. And I was
supposed to say yes and call him daddy while we were having sex."
To emphasize the point that it was defendant who communicated
these instructions, the prosecutor clarified: "And these responses
that you gave him saying yes, were these at his direction?" She
replied, "Yes, ma'am." Leaving no room for doubt, the prosecutor
again emphasized: "He told you to say these things?" Again she
responded, "Yes ma'am."

11

12

13

14

15

16

Whether or not defendant communicated the same instructions
during the marriage as he did before is of little, if any, significance.
The power of the testimony is not when it occurred, but the fact that
defendant demonstrated his obsession for sex with young girls
many years before he acted on his obsession with M. and K. Since
the record demonstrates that this behavior occurred while he was
dating Angela, the privilege would not have kept the damaging
testimony from the jury. As a result, defendant fails to demonstrate
it is reasonably probable that his lawyer's failure to invoke the
marital privilege would have changed the outcome.

17

18

19

20

21

22

Hawes, 2012 Cal. App. Unpub. LEXIS 7307, at **19–21.  As with many of petitioner's

ineffective assistance of counsel claims, this claim fails to show any prejudice at all.  As the Court

of Appeal explained, Ms. Bryant testified that petitioner's penchant for play acting and role

playing began when they were dating.  As such, even if trial counsel had objected to this

evidence, such an objection would not have precluded Ms. Bryant from testifying as to what

happened before they were married.  Accordingly, this claim should be denied.

23

    9.  *Claim 14 – Failure to Conduct Forensic Analysis on Petitioner's Computer*

24

25

26

27

28

Petitioner contends trial counsel was ineffective because she failed to obtain information

from petitioner's computer hard drive.  He argues that if an individual is sexually interested in

children, that interest almost always is accompanied by child pornography.  He claims there was

no child pornography on his computer and thus he has proof that he has no sexual interest in

children.  Petitioner raised this claim in his state habeas corpus petition.  Resp't's Lod. Doc. 11,

19

1   Ground 10.  The trial court rejected this claim stating that petitioner did not attach any

2   documentation of what counsel could have discovered had she obtained a mirror image of

3   petitioner's hard drive.  Resp't's Lod. Doc. 12, at 2.  Even if the jury had this mirror image, it

4   cannot be said that petitioner's "absence of evidence" argument would have provided a

5   reasonable probability of changing the result.  That is, even if petitioner's computer had no

6   evidence of child pornography, there were several witnesses who testified that he in fact had a

7   sexual interest in children and acted on that interest.  As such, petitioner cannot establish

8   prejudice and this claim should be dismissed.

9               *10. Claim 15 – Failure to Subpoena Comcast's Operational Records*

10          Petitioner contends trial counsel was ineffective because she failed to subpoena records

11  from Comcast showing when episodes of Star Trek were televised.  He argues that these records

12  would contradict K.'s testimony that petitioner would molest her while they were on the family

13  room couch watching Star Trek because the show aired at a time when petitioner's wife was

14  home.  As such, so the argument goes, it would have been impossible for the acts of molestation

15  committed on K. to occur as she testified.

16          Petitioner raised this claim in his state habeas corpus petition.  Resp't's Lod. Doc. 11,

17  Ground 7.  The trial court rejected this claim stating that petitioner did not attach any

18  documentation of what counsel could have discovered had she obtained these records from

19  Comcast.  Resp't's Lod. Doc. 12, at 2.  Even if the jury had this information, it cannot be said that

20  would have provided a reasonable probability of changing the result.  That is, even if Star Trek

21  had in fact aired at a time when Rebecca Hawes was home, K. testified that petitioner molested

22  her in his bedroom and in her bedroom as well.  As such, petitioner cannot establish prejudice and

23  this claim should be dismissed.

24            *11. Claims 16 & 17– Failure to Obtain Rape Kits and to Secure a Lie Detector Test*

25          Petitioner claims trial counsel was ineffective for failing to obtain a rape kit from K. and

26  M. and for failing to secure a lie detector test.  He asserts that on the day of his arrest, K. alleged

27  petitioner had molested her that afternoon.  As such, a forensic kit would have been able to show

28  his innocence.  Petitioner raised these claims in his state habeas corpus petition.  Resp't's Lod.

1   Doc. 11, Ground 5 & 14.  The trial court rejected these claims as follows:

> Petitioner also complains that trial counsel failed to demand that a rape kit be prepared for one or both victims.  However, there is no indication that at the time that counsel was appointed (on August 24, 2010, at least four days after the latest charged offense) a rape kit or examination would have revealed any relevant evidence.  In addition, Petitioner argues that counsel failed to present the prosecutor with Petitioner's offer to submit to a lie detector test.  Again, there is no indication that the prosecutor would have accepted the offer or what the lie detector test would have revealed.

Resp't's Lod. Doc. 12, at 2–3.

As the state court concluded, it is not even clear if any kind of forensic testing of K. or M. would have been feasible at the time counsel was appointed.  Furthermore and as respondent notes, counsel did not have the power to compel M. or K. to submit to such testing under California law.  Cal. Penal Code § 13823.95(b).  Again, the decision to perform forensic testing is a tactical one and as noted above (*see supra* Section II.B.1), there may have been several strategic reasons for not seeking this testing.  As to prejudice and petitioner's desire for a polygraph test, the effect of that test would presumably be that petitioner shows he answered the prosecution's questions truthfully.  Petitioner had this opportunity when he testified at trial.  As such, this claim should be dismissed.

### 12. Claim 18 – Failure to Communicate with Petitioner

Petitioner contends trial counsel failed to communicate and consult with petitioner in order to present a defense.  Petitioner presented this claim in a state habeas petition (Resp't's Lod. Doc. 11, Ground 18) which the state court rejected as follows:

> This question was substantively raised during Petitioner's <u>Marsden</u> motion and subsequent hearing.  Although counsel conceded that there was a lack of communication because of Petitioner's mistrust of counsel, the trial court concluded that despite their difficulties, there had not been a breakdown in the attorney-client relationship that resulted in an irreconcilable conflict.  The Court of Appeal agreed.  Since Petitioner has not shown that trial counsel's conduct was objectively unreasonable or that any of the acts or omissions affected the outcome of the case, he has not shown that he is entitled to any relief.

Resp't's Lod. Doc. 12, at 3.  Contrary to petitioner's claim, there is no indication that trial counsel ignored petitioner's questions or failed to communicate important developments, such as a plea

21

1   offer from the prosecution.  See United States v. Blaylock, 20 F.3d 1458, 1465–69 (9th Cir. 1994)

2   (ineffective assistance of counsel for failing to communicate plea offer).

3          There were four sets of complaints which trial counsel addressed to the trial court's

4   satisfaction.  First, petitioner stated that trial counsel had not visited him enough to prepare for the

5   case.  (1 CT 35).  In response, trial counsel noted that she had spent time throughout the case and,

6   as a practice, does not let a month pass without seeing her clients.  (1 CT 46).  Petitioner was also

7   dissatisfied with the fact that he could not view the video recording of K.'s SAFE interview.  (1

8   CT 37).  Trial counsel explained that, for some time, the defense panel policies prevented her

9   from showing the video.  (1 CT 40).  Once those policies lifted that restriction, she put in a

10  request to show the video but had not heard back on the decision of that request.  (1 CT 41).  In

11  addition, petitioner stated that trial counsel failed to subpoena certain witnesses.  (1 CT 41).  Trial

12  counsel had, in fact, hired an investigator to track down these witnesses.  (1 CT 48–49).  That

13  investigator was unsuccessful, despite several attempts, in obtaining statements from some of

14  these witnesses.  (1 CT 48–49).  Finally, as the state court noted, it was clear that there was a lack

15  of trust between petitioner and trial counsel.  (1 CT 41).  Apparently, petitioner simply did not

16  believe trial counsel's responses to his questions.  (1 CT 41, 50–51).  However, the trial and

17  appellate courts found that while the relationship between trial counsel and petitioner was

18  strained, it did not rise to irreconcilable conflict.  This finding was not objectively unreasonable.

19  Furthermore, petitioner cannot demonstrate prejudice.  As discussed *supra*, petitioner's claims of

20  ineffective assistance of counsel, some of which involved trial counsel's tactical decisions to not

21  introduce testimony from certain witnesses and to not seek testing of physical evidence, should be

22  denied.  Thus, petitioner's claims that the breakdown in communication resulted in trial counsel

23  rendering constitutionally ineffective assistance should be denied.

24          *13. Claim 19 – Cumulative Error in Legal Representation*

25          Petitioner argues that he is entitled to habeas relief based on the cumulative errors of trial

26  counsel which effectively rendered representation nonexistent.  Petitioner presented this claim

27  before the state court on habeas.  Resp't's Lod. Doc. 11, Ground 16.  The state court denied

28  petitioner's claim concluding that petitioner "has not shown that trial counsel's conduct was

objectively unreasonable or that any of the acts or omissions affected the outcome of the case . . ."

Resp't's Lod. Doc. No. 12 at 3.  "Cumulative error applies where, 'although no single trial error

examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of

multiple errors may still prejudice a defendant.' " Mancuso v. Olivarez, 292 F.3d 939, 957 (9th

Cir. 2002), quoting United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  In the instant

case, "[b]ecause there is no single constitutional error in this case, there is nothing to accumulate

to a level of a constitutional violation."  Id.  The denial of this claim by the state court was not an

unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

should be denied.

III.    Claim 20 – Failure to Appoint New Counsel

Petitioner claims that the trial court should have appointed him new counsel at the

Marsden hearing.  The California Court of Appeal rejected petitioner's claim as follows:

> Defendant was given the opportunity to vent his complaints about
> his lawyer as justification for his request for a new one. He does not
> suggest otherwise. He recognizes that a criminal defendant is not
> the boss when it comes to trial tactics. Nor can he complain about
> conflicts he manufactures. (Smith, supra, 30 Cal.4th at p. 606.) Yet
> he insists he was entitled to substitute his lawyer because he was
> embroiled in such an irreconcilable conflict with her that ineffective
> representation was likely to result. (People v. Abilez (2007) 41
> Cal.4th 472, 488.)
>
> At his Marsden hearing, defendant listed his grievances. In short, he
> complained that his lawyer did not spend enough time with him, did
> not follow his directions about securing witnesses, did not watch a
> videotape of K.'s SAFE interview with him, did not answer his
> questions, and did not subpoena the medical records about his
> prescription for Levitra.
>
> Defendant's lawyer was an experienced advocate, and more than
> half of her caseload involved sexual abuse cases. She disputed some
> of defendant's allegations and explained others. She assured the
> court she had spent much more time with defendant than he
> represented. She provided defendant with copies of discovery,
> including witness statements and a summary of K.'s SAFE
> interview. Jail policies prevented a viewing of digital recordings.
> Her investigator had worked closely with defendant, followed his
> leads although they did not bear fruit, visited defendant although he
> did not get paid for jail visits, and had investigated matters at
> defendant's request that the investigator believed were irrelevant.
>
> That is not to say that the relationship was without friction.
> Defendant's lawyer explained that defendant did not trust her and

accused her of lying to him. Often the visits became confrontational. Because defendant would not believe her, she conceded there was a lack of communication.

The trial court thus was confronted with a rather garden-variety credibility contest. The court believed defendant's lawyer. The court further found that she had properly represented defendant and would continue to do so throughout the course of the trial. The court concluded, "I find that there has not been a breakdown in the relationship between Mr. Hawes and Ms. Franco and [sic] such a kind that would make it impossible for counsel to properly represent Mr. Hawes."

Discounting, if not ignoring, the exceedingly deferential scope of appellate review, defendant insists the irreconcilable conflict in the relationship entitled him to a new lawyer. We disagree. We can find no abuse of discretion in this record.

From the trial court's up close vantage point, defense counsel met her professional responsibilities to her client and provided proper representation. To the extent the court believed the lawyer and not defendant, we must defer to the court's credibility determinations. Defense counsel spent adequate time with defendant, respected his suggestions, and directed her investigator to work closely with him. Yet she remained in charge and was not obligated to succumb to his every wish and desire, or to adopt his ill informed trial strategy.

Moreover, we must also defer to the court's assessment that the relationship had not deteriorated to the point that adequate representation was in jeopardy. Everyone recognized that communication between lawyer and client was strained. But we reject defendant's assertion that his demands, accusations, and reprisals entitled him to a new lawyer. There is certainly ample evidence here to suggest that he alone had manufactured the conflict. The trial court did not abuse its discretion by shielding the lawyer and the justice system from defendant's manipulation.

Hawes, 2012 Cal. App. Unpub. LEXIS 7307, at **12–15.

Here, the ultimate constitutional question is whether an irreconcilable conflict between trial counsel and petitioner in fact existed. See Schell v. Witek, 218 F.3d 1017, 1026 (9th Cir. 2000) (en banc). As the court of appeal explained, petitioner was given the opportunity to discuss his concerns regarding his trial attorney. (1 CT 34–38). These included failing to follow his suggestions, such as which witnesses to secure and what to investigate, and failing to spend enough time with petitioner. (1 CT 34–38). The trial court then asked trial counsel for her experience revealing that she had been a criminal defense attorney for 13 years and half of her practice consisted of sexual abuse cases. (1 CT 38). Trial counsel revealed that she hired an

24

1   investigator to interview the potential witnesses petitioner identified and spoke with petitioner

2   about his attempts to interview those potential witnesses.  (1 CT 49).  Trial counsel noted there

3   was a lack of communication and that visits were confrontational.  (1 CT 41, 46).  After hearing

4   from petitioner and trial counsel, the trial court found that trial counsel had properly presented

5   petitioner up to that point and that the relationship had no broken so as to prevent trial counsel

6   from properly representing petitioner.  The state court decision rejecting this claim was not

7   unreasonable.  Accordingly, this claim should be denied.

8   IV.   <u>Claim 21 - Admission of Privileged Marital Communications</u>

9         A.  <u>Exhaustion</u>

10        Respondent argues that this claim is unexhausted because petitioner failed to present it

11  before the California Supreme Court.  The exhaustion of available state remedies is a prerequisite

12  to a federal court's consideration of claims presented in habeas corpus proceedings.  <u>See</u> <u>Rose v.</u>

13  <u>Lundy</u>, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); 28 U.S.C. § 2254(b); <u>see</u> <u>also</u>

14  <u>Woodford v. Ngo</u>, 548 U.S. 81, 92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).  A petitioner

15  satisfies the exhaustion requirement by providing the highest state court with a full and fair

16  opportunity to consider all claims before presenting them to the federal court.  <u>Picard v. Connor</u>,

17  404 U.S. 270, 276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); <u>Middleton v. Cupp</u>, 768 F.2d 1083,

18  1086 (9th Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986).  A

19  petitioner is deemed to have exhausted state remedies if he makes a fair presentation of his

20  federal claims to the state courts.  <u>Peterson v. Lampert</u>, 319 F.3d 1153, 1155–56.  Fair

21  presentation requires that a state's highest court has "a fair opportunity to consider [an appellant's

22  constitutional claim] and to correct that asserted constitutional defect."  <u>Picard</u>, 404 U.S. at 276;

23  <u>see</u> <u>also</u> <u>Hiivala v. Wood</u>, 195 F.3d 1098, 1106 (9th Cir.1999) (requiring that petitioner "alert" the

24  state courts of the constitutional issues that are on appeal).

25        Contrary to respondent's claim, petitioner fairly raised this claim in front of the California

26  Supreme Court and thus this claim is exhausted.  On appeal, petitioner argued that the trial court

27  abused its discretion under California law and also rendered the trial fundamentally unfair in

28  violation of the Fourteenth Amendment by permitting evidence of petitioner's sexual role playing

with Ms. Bryant.  Resp't's Lod. Doc. 5, at 48.  In his petition for review before the California

Supreme Court, petitioner argued that the trial court should have excluded this evidence under

California Evidence Code section 352 and that its admission in the trial court was a violation of

petitioner's right to due process of law under the Fourteenth Amendment.  Resp't's Lod. Doc. 9,

at 8.  Accordingly, the undersigned is satisfied that petitioner fairly presented this claim to the

California Supreme Court.

B.  Background

The Third District Court of Appeal addressed this claim as follows:

> According to defendant, if his lawyer is not to blame for allowing
> the jury to hear the evidence of his play-acting a dad having sex
> with his little girl, then the trial court is to blame for allowing
> evidence of prior conduct that is far more prejudicial than
> probative. He argues that admission of the evidence rendered the
> trial fundamentally unfair. The essence of his argument is that his
> play-acting with a consenting adult is not illegal and not indicative
> of an intent to act out the fantasy on a real child.
>
> We review the trial court's admission of the evidence pursuant to
> Evidence Code sections 1101, subdivision (b) and 352 for an abuse
> of discretion. (*People v. Frazier* (2001) 89 Cal.App.4th 30, 42.) The
> trial court explained that the evidence should be admitted under
> section 352 because its probative value substantially outweighed
> the prejudice emanating from disclosure to the jury. Moreover, it
> was also admissible pursuant to section 1101, subdivision (b), as
> the court explained: "On an intent analysis, I find that the
> information is relevant in that the obvious nature of the sexual
> offenses alleged in the current case involves allegations of the
> defendant [engaging in] sexual activity with young girls ranging in
> age from, I think, as young as 5 or 6, up to their early to mid teens.
>
> "Consequently, engaging in sexual activity with an adult who is
> herself portraying a young child both, physically in terms of the
> nature of her dress and visually in terms of the manipulation of her
> hair into pig tails, to include verbal references to calling her sexual
> name daddy is highly relevant and probative on the issue of intent
> necessary to commit the alleged offenses."
>
> We can add little to the court's apt analysis. We reject defendant's
> suggestion that because the conduct was legal and involved a 22-
> year-old woman, it was not probative of his intent with respect to
> young girls. His suggestion ignores the obvious significance of the
> fact that he had his young girlfriend dress like she was a little girl,
> pigtails and all. All the more more damaging is the evidence that he
> made her call him "daddy" during the sexual encounters, thereby
> drawing an even stronger parallel between his prior play-acting and
> his later predatory behavior. We certainly cannot say the trial court
> abused its discretion by admitting evidence that defendant engaged

> in conduct with such a high degree of similarity to the conduct alleged against him. Its probative value is unassailable; that a man who would pretend to crawl into bed with a little girl actually did so many years later may reasonably be inferred.

Hawes, 2012 Cal. App. Unpub. LEXIS 7307, at **22–24.

C.  Analysis

A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law.  Wilson v. Corcoran, 562 U.S. ---, 131 S.Ct. 13, 16, 178 L.Ed.2d 276 (2010).  Absent some federal constitutional violation, a violation of state law does not provide a basis for habeas relief.  Id.  A petitioner may not "transform a state-law issue into a federal one" merely by asserting a violation of the federal constitution.  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997).  Rather, petitioner must show that the decision of the California Court of Appeals "violated the Constitution, laws, or treaties of the United States."  Little v. Crawford, 449 F.3d 1075, 1083 (9th Cir. 2006) (quoting Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475, 480 (1991)).  Accordingly, to the extent petitioner's due process claims are based on alleged violations of state law governing the admissibility of evidence, they should be rejected.

A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  Even so, as the Ninth Circuit has observed:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley, 568 F.3d at 1101.  Therefore, "under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court."  Id.  On the basis of these authorities, the state court's rejection of petitioner's due process claim here does not support federal habeas relief under AEDPA because the admission of

1    evidence at trial regarding sexual role-playing between petitioner and his ex-wife did not violate

2    any clearly established federal law.  See id.

3    V.      Claim 22 - Sufficiency of Evidence

4           Petitioner contends there was insufficient evidence to convict him on Count 12, that he

5    willfully and unlawfully orally copulated K. between August 1, 2007 and June 1, 2008.  1 CT 29.

6    The Third District Court of Appeal rejecting this claim as follows:

> Defendant's final challenge is to the sufficiency of the evidence that
> he orally copulated K. as charged. She testified that when she was
> in the third grade and not yet 10 years old, defendant made her take
> her pants and underwear off and sit on his shoulders. With his face
> in her vagina, he shoved her up against a wall and started licking
> her. At trial she did testify that the oral copulation took place in the
> master bedroom, but she did not identify in which of the houses
> they had lived that it occurred.
>
> Defendant, however, points to excerpts from her SAFE interview in
> which K. had also described defendant's putting her up against the
> wall in his bedroom and orally copulating her vagina by "licking it
> and sucking on it and everything." She thought she was in the third
> grade. During the interview, she stated she was "pretty sure" it
> happened when they lived at a particular address, but she also stated
> that it happened at the other house, too, and "I'd have to say like a
> hundred or more times." Because her mother testified they lived at
> the address K. named between July 2008 and July 2009, and the
> information charged that one act of oral copulation occurred
> between August 1, 2007, and June 1, 2008, defendant contends
> there is insufficient evidence to support the conviction.
>
> Defendant is well aware of the limited scope of appellate review of
> a challenge to the sufficiency of the evidence. We review the
> evidence in the light most favorable to the prosecution and presume
> every fact the jurors could have reasonably deduced from the
> evidence in support of the judgment. (*People v. Griffin* (2004) 33
> Cal.4th 1015, 1028.)
>
> The Supreme Court has provided additional guidance when
> reviewing the sufficiency of the evidence of a child's generic
> testimony. In *People v. Jones* (1990) 51 Cal.3d 294, 315 (Jones),
> the court explained: "[I]n determining the sufficiency of generic
> testimony, we must focus on factors other than the youth of the
> victim/witness. Does the victim's failure to specify precise date,
> time, place or circumstance render generic testimony insufficient?
> Clearly not. As many of the cases make clear, the particular details
> surrounding a child molestation charge are not elements of the
> offense and are unnecessary to sustain a conviction. [Citations.] [¶]
> The victim, of course, must describe the kind of act or acts
> committed with sufficient specificity, both to assure that unlawful
> conduct indeed has occurred and to differentiate between the
> various types of proscribed conduct (e.g., lewd conduct,

28

intercourse, oral copulation or sodomy). Moreover, the victim must describe the number of acts committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe the general time period in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Id.* at pp. 315--316.)

K.'s testimony satisfies the Jones criteria. She described the kind of act with sufficient specificity; that is, she described how defendant licked her vagina. She described the general time period as being when she was in third grade. She described one particular incident of being thrust up against the wall in defendant's master bedroom with particular specificity. Although there was some ambiguity as to whether that incident occurred in one master bedroom or another, the precise location was not essential to sustain the conviction. K. provided sufficient information that it occurred when she was in third grade, and from that testimony the jury could infer that defendant orally copulated her within the time period alleged in the information. His challenge to the sufficiency of the evidence fails.

Hawes, 2012 Cal. App. Unpub. LEXIS 7307, at **24–27.

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).

First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution. Jackson, 443 U.S. at 319, 99 S.Ct. 2781. . . [W]hen "faced with a record of historical facts that supports conflicting inferences" a reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326, 99 S.Ct. 2781; see also McDaniel, 130 S.Ct. at 673–74.

Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable

29

1    doubt." <u>Jackson</u>, 443 U.S. at 319, 99 S.Ct. 2781.

2        [¶ . . .[¶]

3        At this second step, we must reverse the verdict if the evidence of
         innocence, or lack of evidence of guilt, is such that all rational fact
4        finders would have to conclude that the evidence of guilt fails to
         establish every element of the crime beyond a reasonable doubt."
5        <u>See</u> <u>id.</u>

6    <u>Id.</u> at 1164–65.

7        Superimposed on these already stringent insufficiency standards is the AEDPA

8    requirement that even if a federal court were to initially find on its own that no reasonable jury

9    should have arrived at its conclusion, the federal court must also determine that the state appellate

10   court could not have affirmed the verdict under the <u>Jackson</u> standard in the absence of an

11   unreasonable determination.  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).

12       A federal habeas court determines sufficiency of the evidence in reference to the

13   substantive elements of the criminal offense as defined by state law.  <u>See</u> <u>Jackson</u>, 443 U.S. at

14   324 n. 16; <u>Chein v. Shumsky</u>, 373 F.3d 978, 983 (9th Cir. 2004).  California Penal Code section

15   288.7(b) provides "[a]ny person 18 years of age or older who engages in oral copulation or sexual

16   penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of

17   a felony . . . ."  As supplemented by <u>People v. Jones</u>, discussed and cited in the appellate court

18   opinion, K.'s testimony was sufficient to establish the elements of this crime.  Any rational trier

19   of fact could have believed K.'s testimony, which described the kinds of acts petitioner

20   committed, the approximate number of times it occurred and the general time period when the

21   molests occurred. Certainly, the appellate court was not AEDPA unreasonable in finding the

22   evidence sufficient.  As such, petitioner's sufficiency of evidence claim should be denied.

23   VI.    <u>Claim 23 - Brady Claim</u>

24       Petitioner contends the district attorney failed to disclose exculpatory material consisting

25   of DNA evidence, rape/assault kit evidence and computer data.  He raised this claim in a state

26   habeas petition which the trial court denied as follows:

27       A petitioner seeking relief by way of habeas corpus has the burden
         of stating a prima facie case.  (<u>In re Bower</u> (1985) 38 Cal.3d 865,
28

30

1   872.) A petition for writ of habeas corpus should attach as exhibits
    all reasonably available documentary evidence or affidavits
2   supporting the claim. (People v. Duvall (1995) 9 Cal.4th 464, 474.)
    The prosecution has the duty to disclose any material exculpatory
3   evidence to the defense. (Pen. Code, § 1054.1(e); Brady v.
    Maryland (1963) 373 U.S. 83.) The failure to disclose Brady
4   evidence is only prejudicial if the evidence was "material," –
    meaning that that there is a reasonably probability of a different
5   result. (People v. Kasim (1997) 56 Cal.App.4th 1360, 1382.)

6   Petitioner argues that the prosecutor withheld exculpatory evidence:
    that no DNA evidence was located from the evidence seized from
7   Petitioner's residence that would support one victim's statement;
    that no DNA evidence was obtained from any rape kits; and that no
8   child pornography was located on Petitioner's computer. Petitioner
    has not attached any of the evidence that was purportedly withheld.
9   Nor has he shown that it is "exculpatory": absence of evidence is
    not necessarily exculpatory. Finally, Petitioner has not shown that
10  the purported evidence was material. In light of the fact that
    defense counsel could have pointed to the absence of evidence, that
11  Petitioner testified in his own defense denying all of the charges,
    and that the evidence against Petitioner was characterized by the
12  Court of Appeal as "overwhelming [evidence] that defendant
    preyed on M. and K. in a manner consistent with his long-standing
13  attraction to young girls," he has not shown a reasonable probability
    of a different result.

14

15  Resp't's Lod. Doc. 12, at 1–2.

16      A Brady claim contains three elements: "the evidence at issue must be favorable to the

17  accused, either because it is exculpatory or because it is impeaching; [the] evidence must have

18  been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

19  Banks v. Dretke, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (citations and

20  internal quotation marks omitted). But it is not just any prejudice that will be sufficient to make

21  the undisclosed evidence material. "Evidence is material only if there is a reasonable probability

22  that, had the evidence been disclosed to the defense, the result of the proceeding would have been

23  different. A reasonable probability of a different result exists when the government's evidentiary

24  suppression undermines confidence in the outcome of the trial." Jones v. Ryan, 733 F.3d 825,

25  837 (9th Cir. 2013) (citations and internal quotation marks omitted).

26      It is insufficient for a federal court in habeas to make a materiality decision on a de novo

27  basis. Rather, the ultimate inquiry here is whether "fairminded jurists" could not agree with the

28  state supreme court decision that the alleged withheld information in this case was not actionable

31

1    or was immaterial.  Richter, 131 S.Ct. at 786.

2         Petitioner has not indicated that this allegedly withheld evidence even existed.  First,

3    Sergeant Brian Dean, the lead detective on this case, testified that he did not process the physical

4    evidence he retrieved, which included petitioner's bedding, for DNA or fingerprints.  (1 RT 405).

5    As to the rape/assault kit, petitioner admits that one never existed because he claimed his trial

6    counsel was ineffective for failing to obtain one.  See Claim 16.  Finally, as to the computer data,

7    there is no indication that the data was copied or retrieved.  Again, he admits as much in claiming

8    that trial counsel was ineffective for failing to obtain M.'s electronic and social media activity

9    (Claims 7 and 8) and for failing to obtain an image of his hard drive (Claim 14).

10        In effect, petitioner's intended claim appears to be a non-preservation of evidence claim.

11   See, Arizona v. Youngblood, 488 U.S. 51 (1988).  As such, petitioner's intended claim is

12   unexhausted. Moreover, petitioner has failed to set forth any facts regarding an intentional

13   destruction of evidence as required by Youngblood.  With respect to his stated Brady claim,

14   petitioner failed to meet the first element of a Brady claim and, thus, the state court's decision

15   was not objectively unreasonable.  This claim should be denied.

16   VII.    Evidentiary Hearing

17        Petitioner has requested an evidentiary hearing be held to assess the prejudice he suffered

18   in relation to his ineffective assistance of counsel claims.  In Cullen v.Pinholster, 131 S.Ct. 1388

19   (2013), the United States  Supreme Court held that federal review of habeas corpus claims under

20   § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on

21   the merits." 131 S.Ct. at 1398. See also Dow v. Virga, 729 F.3d 1041, 1043 (9th Cir. 2013).

22   Therefore, evidence introduced at an evidentiary hearing in federal court may not be used to

23   determine whether a state court decision on the merits of a petitioner's habeas claim violates §

24   2254(d).  Pinholster, at 1398.  Following the decision in Pinholster, the holding of an evidentiary

25   hearing in a federal habeas proceeding is futile unless the district court has first determined that

26   the state court's adjudication of the petitioner's claims was contrary to or an unreasonable

27   application of clearly established federal law, and therefore not entitled to deference under §

28   2254(d)(1), or that the state court unreasonably determined the facts based upon the record before

1  it, and therefore deference is not warranted pursuant to § 2254(d)(2).

2         Here, this undersigned has already determined that the state court's decision was not

3  contrary to or an unreasonable application of clearly established federal law.  Nor was it an

4  unreasonable determination of the facts.  Therefore, petitioner's request for an evidentiary hearing

5  is denied.

6  CONCLUSION

7         For all the foregoing reasons, the petition should be denied.  Pursuant to Rule 11 of the

8  Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of

9  appealability when it enters a final order adverse to the applicant.  A certificate of appealability

10  may issue only "if the applicant has made a substantial showing of the denial of a constitution

11  right." 28 U.S.C. § 2253(c)(2).  For the reasons set forth in these findings and recommendations,

12  a substantial showing of the denial of a constitutional right has not been made in this case.

13         Accordingly, IT IS HEREBY ORDERED that petitioner's request for an evidentiary

14  hearing is denied.

15         IT IS HEREBY RECOMMENDED that:

16         1.   Petitioner's application for a writ of habeas corpus be denied; and

17         2.   The District Court decline to issue a certificate of appealability.

18         These findings and recommendations are submitted to the United States District Judge

19  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen days

20  after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a documents should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23  shall be served and filed within fourteen days after service of the objections.  Failure to file

24  objections within the specified time may waive the right to appeal the District Court's order.

25  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

26  Dated: July 6, 2015

27                              /s/ Gregory G. Hollows

28                         UNITED STATES MAGISTRATE JUDGE